# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| Mansfield Ambulance, Inc., | ) | CASE NO. 1:16 CV 2016 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Dep't Health and Human Services, *et. al.*, | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

This matter is before the Court upon Plaintiff's Motion for Summary Judgment (Doc. 19) and Defendants' Cross Motion for Summary Judgment (Doc. 20). This is an action for judicial review of the final decision of the Secretary of Health and Human Services concluding that plaintiff owes an overpayment in connection with the Medicare program. For the reasons that follow, plaintiff's motion is DENIED and defendants' motion is GRANTED.

## FACTS

The facts of this case are taken from the Administrative Record ("AR") filed in this case.

1

Plaintiff is a provider of ambulatory services to patient beneficiaries and seeks reimbursement for those services under Medicare Part B. The parties do not dispute that under Medicare Part B, defendant[1] has the authority to enter into contracts with private entities to perform administrative functions including ascertaining whether certain services are "medically necessary." In this case, Palmetto GBA ("Palmetto") performed this service on behalf of defendant with respect to plaintiff.

With respect to ambulatory services, Medicare requires that the ambulatory service be "medically necessary" in order for the claim to be paid. This can be established upon a showing that the patient's condition is such that the use of any other method of transportation is contraindicated. Medicare also covers "nonemergency, scheduled, repetitive ambulance services" in certain circumstances. Plaintiff provided a physician's certification ("PC") in support of its position that some of its claims should be covered. In addition, with respect to certain ambulatory services, plaintiff obtained "pre approval" from Palmetto. Plaintiff received payment from the Medicare Trust for ambulatory services it provided to patients.

Defendant has the authority to enter into contracts with entities to perform reviews and audits. According to defendant, these entities were formerly known as Program Safeguard Contractors and are now known as Zone Program Integrity Contractors. AdvancedMed is one such entity. In 2010, Palmetto requested that AdvanceMed audit plaintiff's claims for payment. AdvanceMed initially conducted a "probe" of 59 claims (representing 116 services) for 10

---

[1] Plaintiff brings this action against both the Department of Health and Human Services and the Secretary of the Department of Health and Human Services. For ease of reference, the Court will refer to these defendants in the singular.

2

patients. AdvanceMed obtained medical records from plaintiff, as well as nursing homes, hospitals, and dialysis centers. Of these 116 services, 83 claims were allowed as billed, 30 claims were denied because the documentation did not support the need for ambulance transfer, and three services were allowed but "downcoded." As a result of the probe, AdvanceMed expanded the review to a Statistical Sampling for Overpayment Estimation ("SSOE"). The SSOE included a review of 242 services. Of those services, AdvanceMed allowed 78 of the claims and denied 162 claims. The remaining two claims were reduced for mileage as the patient was not taken to the nearest facility. (AR at 443-448). The claims are reviewed by a physician based on the documentation submitted. In some instances, the claims were found to be improper even though a PC was submitted for the patient.

Based on the SSOE, AdvanceMed calculated the payment error rate to be 56.88%. (AR at 211). AdvanceMed then extrapolated an overpayment based on the remaining universe of claims submitted by plaintiff. The statistical sampling and extrapolation resulted in an overpayment by defendant of $361,940.00 based on the SSOE and $2,978.86 based on the probe, for a total overpayment of $364,918.86. (AR 443).

Subsequently, it appears that Palmetto was replaced by an entity known as CGS. Plaintiff requested a redetermination by CGS of the assessed overpayment. CGS confirmed that none of the claims were covered and affirmed AdvanceMed's findings in whole. The total amount of the repayment was reduced slightly due to a fee schedule discrepancy. Accordingly, CGS determined that the total amount of repayment to be made by plaintiff equaled $364,874.86. CGS also rejected any argument that plaintiff was entitled to a waiver of repayment. CGS concluded that provider manuals, medicare bulletins, and various other materials serve as notice

of Medicare's requirements. As such, it cannot be said that plaintiff was "without fault" in causing the overpayment.

After the redetermination by CGS, plaintiff sought review by a qualified independent contractor ("QIC"). In this case, C2C Solutions ("C2C") acted as the QIC. During this review, C2C reviewed 167 claims and found in plaintiff's favor with respect to 34 claims, and partially in plaintiff's favor as to an additional claim. With respect to the remaining 132 claims, C2C made an unfavorable determination and upheld the overpayment.

In response to the QIC review, plaintiff sought a hearing before an administrative law judge ("ALJ"). Two statisticians testified at the hearing. Ultimately, the ALJ issued a partially favorable decision with respect to only two claims. With regard to the majority of the ambulatory services, the ALJ concluded that the records did not show that the transports were medically necessary. The ALJ further concluded that the statistical sample and subsequent extrapolation were valid and that plaintiff was not "without fault" in causing the overpayment. Ultimately, the ALJ ordered:

> The random sample and statistical extrapolation performed by the PSC/ZPIC in this case are valid, and the Appellant is liable to refund the overpayment it received. In order to determine the amount of the remaining overpayment, the appropriate Medicare contractor must execute a new, statistically valid extrapolation based on this partially favorable decision, and thereafter issue a notice of revised overpayment amount.

(AR 117).

Plaintiff then appealed the ALJ's decision to the Medicare Appeals Council ("Council"). The council upheld the ALJ's determinations, with the slight exception regarding interest, which is not relevant to this appeal.

Plaintiff appealed the Council's decision to this Court and the parties now cross-move for

4

summary judgment. Each opposes the other's motion.

**<u>ANALYSIS</u>**

1.      Use of extrapolation

Plaintiff argues that defendant erred in using extrapolation to determine the amount of overpayment. The statutory framework governing Medicare expressly addresses the use of extrapolation:

3) Limitation on use of extrapolation

A medicare contractor may not use extrapolation to determine overpayment amounts to be recovered by recoupment, offset, or otherwise unless the Secretary determines that–

(A) there is a sustained or high level of payment error; or

(B) documented educational intervention has failed to correct the payment error.

There shall be no administrative or judicial review under section 1395ff of this title, section 1395oo of this title, or otherwise, of determinations by the Secretary of sustained or high levels of payment errors under this paragraph.

42 U.S.C. § 1395ddd(f)(3).

Here, the initial payment error rate equaled 56.88%. Plaintiff points to no statute or regulatory provision requiring defendant to expressly note that an error rate of nearly 60% qualifies as a "high error rate." It is implicit in defendant's use of extrapolation to calculate the repayment that defendant determined the rate to be "high." *See, Minet v. Sebelius*, 2012 WL 2930746 (finding that an error rate of 100% with no express finding is implicitly a "high level of payment error."). And, as noted by defendant and expressly set forth in the statute, this Court cannot review defendant's determination of a "high level of payment error." *See, e.g., Gentiva Healtcare Corp. v. Sebelius*, 723 F.3d 292, 296 (D.C. Cir. 2013)("We also agree with the district court that § 1395ddd(f)(3) precludes us from reviewing the merits of the "sustained or high level

5

of payment error" determination that permitted the contractor to use extrapolation to calculate overpayment amounts in this case."). This preclusion of judicial review applies even when the administrative appeals process reduces the total overpayment due and defendant orders re-extrapolation. *See, e.g., Momentum EMS, Inc. v. Sebleius*, 2014 WL 199061 at *2 (S.D. Tex. Jan. 13, 2014); *John Balko & Associates, Inc. v. Sebelius*, 2012 WL 6738246 (W.D. Pa. Dec. 28, 2012)("whether that determination was made at the appropriate time is immaterial to this Court's jurisdiction to adjudicate...[the] high error rate argument. The language of the statute is unambiguous, that there "shall be no ... judicial review ... of determinations by the Secretary of sustained or high levels of payment errors under this paragraph."); *Morgan v. Sebelius*, 2012 WL 1231960 (S.D.W.Va. April 12, 2012)("The central thrust of this argument is that his repayment amount has been so drastically reduced during the course of Dr. Morgan's appeals, from $614,222.95 to $61,922, that the reduced amount cannot justify a finding of a sustained or high level of payment error. While this is intuitively appealing, Plaintiff's argument ultimately fails [because such determinations are non-reviewable.]"). *See also*, 42 C.F.R § 405.926(p). Based on the clear and unequivocal statutory language, this Court cannot review defendant's determination of a high level of payment error, including the timing of such determination. Thus, plaintiff's argument that defendant erred in not "re-determining" whether a high level of payment error exists is unreviewable and the argument is rejected.

Plaintiff also argues that the use of extrapolation to determine the amount of overpayment violates due process. Plaintiff claims that because defendant extrapolated the repayment instead of addressing each claim individually, plaintiff cannot determine which patients to seek payment from. According to plaintiff, this violates procedural due process. As defendant notes, circuit

6

courts generally recognize that the use of statistical sampling does not violate due process provided the claimant has an opportunity to rebut the evidence. *See, Chaves County Home Health Services v. Sullivan*, 931 F.2d 914 (D.C. Cir. 1991)("the private interest at stake is easily outweighed by the government interest in minimizing administrative burdens; in light of the fairly low risk of error so long as the extrapolation is made from a representative sample and is statistically significant, the government interest predominates"); *Yorktown Medical Lab., Inc. v. Perales*, 948 F.2d 84 (2d Cir.1991)(no due process claim for use of extrapolation because balancing of interests weighs in favor of the government); *Ratanasen v. State of California, Dep't of Health and Human Servs.*, 11 F.3d 1467 (9th Cir. 1993)("We now join other circuits in approving the use of sampling and extrapolation as part of audits in connection with Medicare and other similar programs, provided the aggrieved party has an opportunity to rebut such evidence."). The Sixth Circuit has also approved of the use of statistical sampling in connection with the recovery of public funds. *See, e.g., Michigan Dept. of Educ. v. U.S. Dept. of Educ.*, 875 F.2d 1196 (6th Cir. 1989).

Here, the Court rejects plaintiff's claim that statistical sampling violates due process because plaintiff will be unable to recover the repayment directly from the patient. During the administrative process, defendant determined as follows:

> We have reviewed the charges at issue with regard to whether the services were reasonable and necessary. We found that the services were not reasonable and necessary. We have further determined that the patients did not know and could not have been expected to know that these services were not covered or not fully covered by Medicare. However, we find that based upon the regulations cited above, you knew or could have been expected to know, that these services were not covered or not fully covered by Medicare. We also find that you did not notify the beneficiaries in writing, before the services were furnished, that Medicare likely would not pay or not fully pay for the services.

7

Thus, defendant expressly determined that the services were not reasonable and necessary and that the patients "did not know and could not have been expected to know" that the services were not covered. Nonetheless, plaintiff argues that it can collect from these patients because it was not required to provide the patients with an Advance Beneficiary Notice ("ABN"), which would have alerted the patients that the service may not be covered by Medicare. Plaintiff claims that an ABN is required before payment can be collected, but that ambulance services are excluded from the requirement. The materials provided by plaintiff, however, do not support this position. The Medicare publication MM7821, which plaintiff attaches to his opposition brief, indicates that in certain circumstances an ABN cannot be issued. Those services include emergency ambulance transportation. However, the publication indicates that an ABN "must be issued" if the following three questions are answered in the affirmative:

(1) Is this service a covered benefit?

(2) Will payment for part or all of this service be denied because it is not reasonable and necessary; and

(3) Is the patient stable and the transport non-emergent?

Here, plaintiff does not dispute that Medicare covers "nonemergency, scheduled, repetitive ambulance services," but as set forth above defendant denied these services as "not reasonable and necessary." Nor does plaintiff argue that the transports involved an emergency. As such, the Court is not convinced that plaintiff's due process rights were violated by extrapolation because plaintiff could have collected directly from the patients. The argument is rejected.

Next plaintiff claims that its due process rights were violated because of an

"unidentifiable discrepancy" in the claims reviewed by AdvanceMed and C2C. Plaintiff's argument is somewhat lacking in clarity, but it appears to be two-pronged. In his motion, plaintiff's argument in its entirety consists of the following:

> There is an unidentified discrepancy in the number of claims reviewed by [AdvanceMed] and [C2C]. [AdvanceMed] reviewed 59 claims. However, [C2C] reviewed 84.
>
> The addition of claims previously not at issue makes it impossible for plaintiff to know the claims at issue or to respond. This invalidates the sampling and makes extrapolation improper. This error was brought to the attention of the [Council] but was not resolved. This discrepancy makes the statistical sampling and extrapolation uncertain. The extrapolation damages cannot be sustained, and constitutes a violation of due process of law.

Thus, it appears that plaintiff is claiming that due process is violated because plaintiff does not know the precise claims at issue and, therefore, cannot respond in a meaningful way. Plaintiff further argues that the addition of the claims invalidates the sampling. With regard to plaintiff's argument that it was unaware of what claims were at issue or how to respond thereto, the argument is rejected. As defendant notes, both AdvanceMed and C2C provided spreadsheets specifically identifying the claims at issue. Moreover, the spreadsheets created by C2C and the ALJ provided specific reasons for the claim denials. It appears, however, from plaintiff's brief in opposition, that plaintiff no longer claims that it is unable to respond to the unidentified claims. Rather, plaintiff's focus is on the fact that the "probe" claims were added to the SSOE claims, rendering the sampling invalid. As an initial matter, plaintiff did not fully develop this argument in its own motion. Rather, plaintiff significantly expanded on this argument only in opposition to defendant's motion. Regardless, the Court finds that the argument lacks merit.

As noted by the ALJ, the use of statistical sampling does not offend due process. Rather, it creates a presumption of validity as to the amount of overpayment (AR 115); HCFA Ruling

9

86-1.[2] "The burden then shifts to the provider to take the next step." *Id*. Here, the ALJ relied on two statisticians in concluding that the sampling methodology on which extrapolation is based is statistically sound. Plaintiff offers only generalized attorney argument suggesting that the inclusion of claims involved in the probe somehow renders the sampling invalid. It appears that plaintiff also presented this argument in unsupported fashion to the Council. (AR 9)("The appellant asserts, without further explanation, that there is an 'unexplained difference in the number of claims determined by [AdvanceMed] and [C2C]' thereby invalidating the sampling and resulting extrapolation."). This is not sufficient to support a finding that the procedures afforded to plaintiff to dispute the use of extrapolation violate due process. Nor is it sufficient to warrant a finding that defendant's determination in this regard is not supported by substantial evidence.

The Court further finds that the inclusion of pre-approved claims in the sampling does not violate due process or render the statistical sampling invalid. Certain claims included in the random sampling analysis were "pre-approved" before plaintiff provided the ambulatory service. Plaintiff summarily argues that the inclusion of these claims renders the sample invalid. As one statistician testified, however, the sample was in fact random because it selected from the entire universe of post-paid claims. (AR 7547-49). It appears that to *except* a subset of those claims would in fact render the sample non-random. Accordingly, the use of extrapolation does not violate due process.[3]

---

[2] In the opinion, the ALJ referred to this ruling as CMS Ruling 86-1. It appears that the ruling is now known as HCFA Ruling 86-1.

[3] In its brief in opposition, plaintiff argues that C2C improperly disapproved a claim that plaintiff did not appeal and for which

10

2.   Physician certification

Plaintiff argues that it complied with the Medicare requirements by obtaining PCs prior to providing non-emergency transport services. In essence, plaintiff argues that the presence of a PC for a patient automatically satisfies Medicare's "medical necessity" requirement. In other words, defendant improperly "overruled" the PC. In response, defendant argues that medical necessity is always required for Medicare reimbursement. According to defendant, the requirement that a PC be obtained for non-emergency transport services does not supplant the rule. Rather, it adds a requirement for coverage to occur.

42 C.F.R. § 410.40 provides as follows:

(d)(2) <u>Special rule for nonemergency, scheduled, repetitive ambulance services</u>. Medicare covers medically necessary nonemergency, scheduled, repetitive ambulance services if the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a written order from the beneficiary's attending physician certifying that the medical necessity requirements of paragraph (d)(1) of this section are met....

(d)(3) <u>Special rule for nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetitive basis</u>. Medicare covers medically necessary nonemergency ambulance services that are either unscheduled or that are scheduled on a nonrepetitive basis under of the following circumstances:

\*\*\*

(v)   In all cases, the provider or supplier must keep appropriate documentation of file and, upon request, present it to the contractor. The presence of the signed certification statement or signed return receipt does not alone demonstrate that the ambulance transport was medically necessary. All other program criteria must be met in order for payment to be made.

At the time of the provision of the services at issue in this case, subsection (v) applied

---

approval had been provided by AdvanceMed. Plaintiff claims that C2C lacked jurisdiction to review that claim. Plaintiff, however, cites no law or regulation in support of its position.

11

only to "unscheduled" nonemergency ambulatory services. Subsequently, 42 C.F.R. § 410.40 was amended such that the paragraph became applicable to "scheduled" nonemergency ambulatory services as well.

With regard to the existence of a PC, the Medicare Benefits Policy Manual provides as follows:

> Medical necessity is established when the patient's condition is such that use of any other method of transportation is contraindicated. In any case in which some means of transportation other than an ambulance could be used without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made for ambulance services. In all cases, the appropriate documentation must be kept on file and, upon request, presented to the A/B MAC (A) or (B). It is important to note that the presence (or absence) of a physician's order for a transport by ambulance does not necessarily prove (or disprove) whether the transport was medically necessary. The ambulance service must meet all program coverage criteria in order for payment to be made.

(MBPM § 10.2.1)

Upon review, the Court rejects plaintiff's argument. Plaintiff claims that the statutory scheme clearly and unambiguously provides that the existence of a PC conclusively establishes medical necessity. The provision relied on by plaintiff, however, provides that "Medicare covers *medically necessary* nonemergency, scheduled, repetitive ambulance services *if* the ambulance provider or supplier, before furnishing the service to the beneficiary, obtains a [PC].... 40 CFR § 410.40(d)(2)(emphasis added). This provision expressly requires that the service be "medically necessary" before payment will be made, which is consistent with Medicare's entire scheme. The provision, however, places a *further* condition on providers of nonemergency scheduled transport services. For these services, providers must also provide a PC. To accept plaintiff's interpretation of the provision would read the "medically necessary" entirely out of the statute and make the language superfluous. The fact that subsection (v) initially appeared only with

12

respect to "scheduled" transport services does not alter the Court's conclusion. At the very best, this language's absence from the subsection dealing with "scheduled" transports, renders the provision ambiguous. But the Court will defer to the agency's reasonable interpretation of its regulation. Here, the agency's reasonable interpretation as set forth in MBPM § 10.2.1 provides that the existence of a PC does not automatically satisfy the "medical necessity" requirement. The Court will defer to that interpretation.

Moreover, the Fifth Circuit expressly held that "possession of a [PC]–even one that is legitimately obtained–does not permit a provider to seek reimbursement for ambulance runs that are obviously not medically necessary." *See, United States v. Read*, 710 F.3d 219 (5th Cir. 2012). Plaintiff attempts to distinguish *Read* on the basis that the case involved fraud on the part of the provider in securing the PC. In fact, plaintiff concedes that in situations involving fraud, the regulation cannot be read as plaintiff suggests. But, *Read* cannot be read so narrowly as the court expressly noted that PCs–even those that are *legitimately* obtained–do not automatically satisfy the medical necessity requirement. Moreover, plaintiff wholly fails to explain why actions involving fraud– as opposed to gross negligence or the like– would be exempted from the regulation. Regardless, the Court finds that the analysis in *Read* is persuasive and consistent with this Court's reasoning.[4]

---

[4] Plaintiff relies on two unreported cases wherein district courts have held that defendant erred in reviewing logs of ambulance runs where PCs were on file. *See, First Call Ambulance Service, Inc. V. Dep't Health and Human Servs*., 2012 WL 769617 (MD. Tenn. March 8, 2012); *Moorecare Ambulance Service, LLC, Dep't of Health of Human Servs*., 2011 WL 839502 (MD. Tenn. March 4, 2011). This Court disagrees with the reasoning contained in those cases and declines to follow the rationales. The Court does not read the statute as unambiguously preventing defendant from

13

3. "Without fault"

Plaintiff argues that defendant erred in permitting the review of claims for which pre-certification had been obtained. According to defendant, these claims should not be reconsidered or reopened. Again, as with other issues raised in the briefing, plaintiff points to no law or regulation that prohibits an audit from including claims for which providers obtained pre-approval. As such, the argument is not well-taken.

Plaintiff's argument that defendant erred in denying a limitation on liability for overpayment is also rejected. As an initial matter, plaintiff relies on wholly inapplicable provisions of the Code of Federal Regulations. The ALJ relied on 42 C.F.R. § 405.350(c) as "guidance" for whether plaintiff is entitled to a "waiver" of the overpayment. In essence, the ALJ concluded that in order to be exempt from repayment, plaintiff must have: (1) made full disclosure of all material facts; and (2) on the basis of the available information, including Medicare instructions and regulations, it had a reasonable basis for assuming the payment was correct. The ALJ further cited Section 90.1 H of the Medicare Financial Management Manual for the proposition that a "provider would be liable for refunding the overpayment if [it] billed for items or services which it should have known were not covered; for instance, when the policy or rule is in the provider manual or in the CFR." (AR 116). Here, the ALJ concluded that plaintiff is presumed to be aware of the widely publicized and strict requirements regarding ambulance transport coverage. And, plaintiff is required to maintain and submit sufficient medical documentation to justify that the transport qualifies as a covered claim. The ALJ rejected plaintiff's argument that the pre-certification somehow mandates a finding of "waiver,"

---

challenging the validity of a PC.

14

on the basis that the "transport records so obviously show that most Beneficiaries were able to sit in a wheelchair, were therefore not bed-confined, and did not require medical monitoring en route." In other words, plaintiff's own transport records demonstrate that the claims–even those for which pre-certification was obtained – are not subject to Medicare coverage. Plaintiff does not dispute any of the findings made by the ALJ.[5] Accordingly, the Court finds that the ALJ's determination that plaintiff is required to make the repayment is supported by substantial evidence.

4. "Medical necessity"

Plaintiff makes a summary and undeveloped argument regarding "medical necessity." According to plaintiff's motion, CMS has published ambulance codes that "make clear" that there are four categories of patients that "may" be covered and that medical necessity is not limited to patients who are "bed-confined." Plaintiff then identifies these four codes. Plaintiff points to four patients that plaintiff claims "clearly meet these criteria." With respect to each patient, plaintiff provides a basic description of the patient's condition. By way of example, plaintiff cites to patient V.B.:

> V.B. Medical records show patient has left below-the knee amputation. Patient was transferred by draw sheet when moved. Patient also has a right forefoot amputation and Patient had an approved medical necessity Ambulance Coverage Pre Payment Claim Decision for an indefinite period of time from Palmetto GBA.

Plaintiff, however, wholly fails to point to any regulation (or specific ambulance code for

---

[5] Moreover, as defendant notes, the pre-certifications often spanned a period of time, as opposed to specific ambulance transports. Thus, the fact that certain trips were covered by a prior certification diminishes plaintiff's argument in that the pre-certification was not done on a claim by claim basis.

15

that matter) demonstrating that the ALJ's decision to deny this claim is not supported by substantial evidence. In response, defendant notes that ambulance codes themselves provide that use of a code does not guarantee coverage. In its brief in opposition, plaintiff responds that it "stands" on the motion with respect to the four patients, as the government offered no response. But, the government responded with argument regarding why ambulance codes are not sufficient to warrant coverage. This response is not unreasonable in light of the convoluted nature of the issue as presented by plaintiff. Plaintiff developed no argument with respect to each of the four patients and instead cites generically to facts regarding each of them. Plaintiff's citation to certain facts, standing alone, is not sufficient to warrant reversal of the ALJ's decision with respect to these four patients.

The Court further rejects plaintiff's argument that the ALJ somehow required more documentation than is required by CMS or, alternatively, the ALJ's documentation requirements are unconstitutionally vague. Again, this argument is only summarily developed. Regardless, the ALJ made clear that while the documentation provided was sufficient to document medical conditions, it "sorely lacks clinical evidence showing that the Beneficiaries were either confined to a bed or that other methods of transportation were...contraindicated." In other words, the ALJ held that the documentation provided by plaintiff did not establish entitlement to payment by Medicare for these ambulatory services. Plaintiff's argument that the ALJ somehow required "too much" documentation is rejected.

   5.   C2C's review

Plaintiff argues that a publication interpreting the Medicare Claims Processing Manual directs that C2C was required to provide detailed explanations for its denials and that C2C failed

16

in this regard. In response, the government notes that AdvanceMed and the ALJ provided detailed reasoning to support the denials. Plaintiff replies summarily that "plaintiff has been deprived of its right to the process that is due....[T]his violation of Plaintiff's Constitutional right to due process should cause this case to be reversed." The Court rejects plaintiff's argument that any failure by C2C to provide sufficiently detailed reasons for its denials somehow violates plaintiff's due process rights. Generally, these requirements are in place to permit judicial review of plaintiff's claims. Plaintiff does not argue or point to any instance in which any failure on the part of C2C precludes adequate judicial review. This is especially so in that plaintiff does not dispute that both AdvanceMed and the ALJ provided sufficient reasoning for the denials. For this reason, plaintiff's argument is rejected.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Cross Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

      /s/ Patricia A. Gaughan
      PATRICIA A. GAUGHAN
      United States District Judge

Dated: 5/10/17